David E. Comstock, ISB No.: 2455
**LAW OFFICES OF COMSTOCK & BUSH**
199 N. Capitol Blvd., Ste 500
P.O. Box 2774
Boise, Idaho 83701-2774
Telephone: (208) 344-7700
Facsimile: (208) 344-7721
*dec@comstockbush.com*

Erika Birch, ISB No.: 7831
**STRINDBERG & SCHOLNICK, LLC**
802 W. Bannock St., Ste 308
Boise, ID 83702
Telephone: (208) 336-1788
Facsimile: (208) 287-3708
*erika@idahojobjustice.com*

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DIANE HULBERT, RONALD R. REAVES, and DEBORAH GAIPL, <br><br> Plaintiffs, <br><br> vs. <br><br> AMERICAN INSTITUTE OF HEALTH TECHNOLOGY, INC. dba CARRINGTON COLLEGE, an Idaho Corporation; U.S. EDUCATION CORPORATION, a Delaware Corporation, and DEVRY EDUCATION GROUP, INC. a Delaware Corporation, <br><br> Defendants. | Case No. <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Diane Hulbert, Ronald R. Reaves, and Deborah Gaipl, by and through their attorneys of record, complain and allege as follows:

**COMPLAINT AND DEMAND FOR JURY TRIAL- 1**

## I.     NATURE OF CASE

1. This is an action for damages due to deprivation of rights secured by the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.*, the Idaho Human Rights Act ("IHRA") Idaho Code § 67-5909 *et seq.*, and Idaho state law.

## II.     JURISDICTION

2. This Court has original jurisdiction over Plaintiffs' federal claims and the actions asserted herein pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367.

## III.     VENUE

3. Venue in this District is proper under 28 U.S.C. § 1391 (b) and (c), because the Defendants are all residents of Idaho, operating business in the state in which this District is located, and a substantial part of the acts, events or omissions giving rise to the claims alleged herein occurred in this District. Venue is proper within the Southern Division of this District, pursuant to Local Civil Rule 3.1, because Defendants are residents and/or own and operate businesses in Ada County.

## IV.     PARTIES

4. Plaintiff, Diane Hulbert is a citizen of the state of Idaho under 28 U.S.C. § 1332, living and residing in the State of Idaho, County of Ada, City of Meridian. Ms. Hulbert, having received her first degree in nursing in the 1970's, continued to further her education in nursing including earning a Master's degree in nursing in 2001. She consistently worked in the nursing field, most recently as a midwife practitioner, prior to being hired at Carrington in March of 2009.

**COMPLAINT AND DEMAND FOR JURY TRIAL- 2**

5.      Plaintiff, Ronald R. Reaves, is a citizen of the State of Idaho under 28 U.S.C. § 1332, living and residing in the State of Idaho, County of Ada, City of Meridian. Mr. Reaves began his career in nursing as a medic in the military in the 1970s and received various certificates and degrees including a Master's degree in Nursing and Management. When he was hired by Carrington in 2007, Mr. Reaves had over 35 years of nursing related experience.

6.      Plaintiff, Deborah Gaipl, is a citizen of the state of Idaho under 28 U.S.C. § 1332, living and residing in the State of Idaho, County of Ada, City of Boise. Ms. Gaipl received her first degree in nursing the 1970's. She obtained her Master's degree in nursing in 1998 and had 35 years of nursing experience, and teaching experience, prior to being hired at Carrington College in March 2010.

7.      Defendant, DeVry Education Group, Inc. (DeVry), is a Delaware Corporation with its principal place of business in Downers Grove, Illinois. It is a publicly traded business registered with the New York Stock Exchange and Canadian Securities Exchange. DeVry is a global provider of educational services including medical and healthcare education services which it offers through various subsidiaries. As reported in DeVry's most recent 10-K form, DeVry acquired the parent organization of Carrington College in 2008. DeVry, through its subsidiaries, owns and operates for-profit colleges, like Carrington College, in the State of Idaho and upon information and belief employed Plaintiffs at all relevant times herein.

8.      Upon information and belief Defendant U.S. Education Corporation (USEC), a Delaware corporation, with its principal place of business in Downers Grove, Illinois is a wholly owned subsidiary of DeVry and is the parent and/or controlling company of Defendant American Institute of Health Technology. USEC through its subsidiaries, owns and operates for-profit

colleges, like Carrington College, in the State of Idaho and upon information and belief employed Plaintiffs at all relevant times herein.

9. Defendant, American Institute of Health Technology, Inc. is an Idaho Corporation doing business under the brand name Carrington College, with its principal place of business listed at the same location as Defendant DeVry, in Downers Grove, Illinois. American Institute of Health Technology, Inc. owns and operates a for-profit college in Idaho and employed the Plaintiffs at all relevant times herein. Defendants will hereafter be referred to collectively as Defendants or Carrington.

## V.    ADMINISTRATIVE PROCEEDINGS

10. Plaintiffs filed timely Charges of Discrimination with the Idaho Human Rights Commission ("IHRC") and the Equal Employment Opportunity Commission ("EEOC") alleging a pattern and practice of age discrimination on behalf of themselves and those similarly situated.

11. The IHRC has issued all three Plaintiffs a *Notice of Right to Sue,* and this Complaint is being filed within 90 days of the receipt of the same.

12. All administrative prerequisites have been met.

## VI.    GENERAL ALLEGATIONS

13. DeVry Education Group and its subsidiaries, including Carrington College, operate for-profit colleges throughout North America. This includes a Carrington College campus in Boise, Idaho which offers several degrees and certificates in the nursing field.

14. Carrington hired Mr. Reaves in August 2007 to be part of its nursing faculty. Likewise, Carrington also hired Ms. Hulbert in March 2009, and Ms. Gaipl in March 2010 as nursing faculty members.

**COMPLAINT AND DEMAND FOR JURY TRIAL- 4**

15. Upon information and belief, in 2011, Carrington's corporate office asked the then nursing program director to perform a "SWOT" analysis (strengths, weaknesses, opportunities, and threats). As part of this SWOT, the age of the nursing faculty was identified as a "weakness."

16. At this time, the Plaintiffs were in their late 50s/early 60s.

17. In November 2011, Carrington told the nursing faculty, including Plaintiffs, that the age of the faculty was identified as a "weakness" as part of the SWOT.

18. Sometime in 2012, Carrington hired Trudi Sabaj as the nursing program director in Boise.

19. After taking over as program director, Ms. Sabaj directed one of her employees to gather all the ages of the current faculty in order to determine the average age of the Carrington nursing faculty in Boise. Ms. Sabaj then compared the average age of the Boise faculty with the average age of nursing faculty nationwide, and determined that Carrington's Boise faculty was much older than the national average. Ms. Sabaj brought up this average age differential at the next faculty meeting, and she continued to talk about the aging faculty at Carrington in subsequent meetings.

20. Ms. Sabaj also began making comments along the lines of "I really do need to start getting some new, younger employees in here."

21. Ms. Sabaj then hired a young woman who was in her early thirties, Kelley Larsen, as a nursing faculty member and Sabaj quickly gave Ms. Larsen significant managerial responsibilities. Ms. Larsen acted as an unofficial assistant program director throughout most of 2014.

**COMPLAINT AND DEMAND FOR JURY TRIAL- 5**

22. Upon information and belief, Ms. Larsen became the acting program director in or near October 2014, and ultimately became the program director in December 2014.

23. Ms. Larsen is 20 to 30 years younger than Plaintiffs and perpetuated stereotypical beliefs about older workers including giving the impression that because she was younger than the existing staff she was more attuned to modern ways of nursing.

24. According to multiple faculty members, Ms. Sabaj and Ms. Larsen made pervasive, ageist comments. As examples reported by these witnesses:

- Ms. Sabaj brought up age-related comments, specifically that she needed to hire younger employees, on more than one occasion.

- Ms. Sabaj said to a faculty member suffering some health issues, "Because you aren't getting any younger, your health problems are only going to get worse." She then asked her, "Are you even still capable of doing your job?"

- After a 59-year-old faculty member was terminated, and a 33-year-old member was hired, Ms. Larsen said, "Finally, there is someone here my age I can talk to."

- Ms. Sabaj and Ms. Larsen commented about the age of the faculty at least once every three weeks. These ageist comments referred to the faculty and were generally along the lines of: "We need to get younger people in here;" or "We need younger people to teach the clinicals."

- Ms. Sabaj commented several times that the faculty was too old and that she wanted a younger faculty.

- Ms. Larsen once excused an inappropriate comment made by a younger instructor saying that she was just "young."

- Ms. Sabaj said, at least once, that Carrington needed new blood, new faculty.

25. Based on documents provided by Carrington, it appears that Ms. Sabaj and Ms. Larsen were able to fulfill the desire to rid the Boise nursing program of older employees and

**COMPLAINT AND DEMAND FOR JURY TRIAL- 6**

bring in younger faculty members. This is evidenced by the following:

- During 2014-2015, Carrington separated more than a dozen employees in the nursing program. Of those separated, thirteen employees were 40 or older, and only two were younger than 40.  Additionally, the average age of all employees terminated during the same timeframe was nearly 55 years of age.

- During this same timeframe (2014-15), and prior to Carrington receiving notice of Ms. Hulbert's charge of discrimination, Carrington hired fifteen new faculty members. The majority of the hired employees were younger than the Plaintiffs. In fact, seven of Carrington's new hires were in their 30s, and the average age of all nursing faculty hired was 45.6, which is approximately ten years younger than the average age of faculty fired.

- The average age of Carrington College's primary instructors dropped by approximately 8.5 years of age during the 2014-2015 timeframe.  Carrington College's primary instructor age was 52.7 years of age at the start of 2014, and two years later it had dropped to 44.2 years of age.

26.     Among the older employees that were fired or forced out by Carrington was Mr. Reaves (age 62) fired in December 2014, and Ms. Hulbert (age 66) and Ms. Gaipl (age 60) constructively discharged in May 2015.

## VII. GENERAL ALLEGATIONS – MR. RON REAVES

27.     Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth herein.

28.     During Mr. Reaves' final semester at Carrington College, he taught three 12-hour

**COMPLAINT AND DEMAND FOR JURY TRIAL- 7**

clinical rotations per week.

29.     The "most important message" included in Mr. Reaves' last performance evaluation contained the following statement: "Ron, you are a valued team member. I thank you for the hard work, extra help to others and your kind willingness to pinch hit as a technology problem solver for your team."

30.     After Ms. Larsen became the acting director in October 2014, it took very little time (two months) for her to fire Mr. Reaves.

31.     Prior to his termination, Ms. Larsen harassed Mr. Reaves. For example:

- Ms. Larsen removed Mr. Reaves from his cubicle to make room for a new, younger employee (age 36 at time of hire).

- Ms. Larsen started harassing Mr. Reaves about student evaluations.  Ms. Larsen was hyper-critical of Mr. Reaves' student evaluations, and accused him of failing to follow proper procedure during a time of intense and constant changes to paperwork requirements.

- Additionally, in an email dated October 30, 2014, Ms. Larsen prematurely chastised Mr. Reaves for not yet completing his student evaluations.

- Finally, Ms. Larsen, alleging various performance failures, placed Mr. Reaves on a 60-day Performance Improvement Plan ("PIP") on or near November 6, 2014.

32.     Mr. Reaves took the PIP seriously and was at all subsequent times in compliance with its requirements.  The PIP included a 60-day period for Mr. Reaves to improve the alleged performance failures and remain in compliance with the PIP.  However, Ms. Larsen fired Mr. Reaves *before* the plan's 60 days to improve lapsed, and despite Mr. Reaves's compliance with

the PIP.

33. On or about December 18, 2014, Ms. Larsen called Mr. Reaves into her office and fired him with little to no explanation.

34. The clinics taught by Mr. Reaves were generally taken over by substantially younger instructors or simply not taught the following semester(s). These substantially younger persons include faculty members aged 30, 36, and 45.

### VIII.  GENERAL ALLEGATIONS – MS. DEBORAH GAIPL

35. Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth herein.

36. Ms. Gaipl was a nursing instructor at Carrington College for over five years, and consistently achieved stellar performance reviews at the second highest or highest level rating throughout her career.

37. Ms. Gaipl first began worrying about her job security when "aging of the faculty" was identified as a weakness. Ms. Gaipl also watched as her "aged" coworkers were fired and/or forced out and substantially younger employees replaced them.

38. The situation worsened further, and Carrington's discrimination became pervasive enough to create intolerable working conditions when Ms. Gaipl began reporting to Ms. Larsen in October 2014.

39. Ms. Larsen harassed Ms. Gaipl in a variety of ways including the following:

- Ms. Larsen assigned Ms. Gaipl with an excessive workload and duties that younger employees were not required to perform. Most faculty were assigned

only two to three courses, however, Ms. Larsen assigned Ms. Gaipl to teach five courses.

- Ms. Larsen assigned Ms. Gaipl to plan a company Holiday party in just three weeks and refused to provide assistance. Ms. Gaipl had not volunteered for this assignment, and it was well known that she had not participated in any previous Holiday parties. Ms. Gaipl was so worn out and exhausted by the time the Holiday party occurred that she was unable to attend.

- Ms. Larsen disparately enforced allegedly company-wide policies against Ms. Gaipl and other older faculty. Ms. Larsen required Ms. Gaipl and Ms. Hulbert to post their office hours on their doors claiming it was policy. However, younger instructors did not, and were not required to, post their office hours on their doors.

- Ms. Larsen also staffed Ms. Gaipl with unfamiliar duties and refused to provide guidance or evaluation criteria. Ms. Larsen assigned Ms. Gaipl to manage Carrington's testing center, even though she had no experience doing so and already had a heavy workload. Ms. Larsen refused to provide evaluation criteria for the testing center assignment, claiming that it could be located on Carrington's employee intraweb. However, Ms. Gaipl was unable to locate the evaluation criteria anywhere.

- Ms. Gaipl also submitted four separate complaints about younger instructors' inappropriate conduct. Carrington College took no action on these complaints, but instead condoned the inappropriate conduct and policy violations of younger faculty. On at least one occasion, Ms. Larsen shrugged off a complaint regarding

**COMPLAINT AND DEMAND FOR JURY TRIAL- 10**

inappropriate conduct, explaining that instructor was just young.

40. Ms. Gaipl realized that Ms. Larsen was setting her up for failure, as she had seen happen to other older faculty members. Ms. Gaipl's work environment had become so unbearable that she was forced to resign on or about May 13, 2015, rather than remain in what had become a hostile work environment.

41. Based on information and belief, younger employees were hired and/or assigned to assume Ms. Gaipl's former job responsibilities.

### IX.     GENERAL ALLEGATIONS – MS. DIANE HULBERT

42. Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth herein.

43. Ms. Hulbert was initially a part-time clinical instructor, but became a full-time faculty member in 2013.

44. Ms. Hulbert always received positive comments on her performance evaluations, and no performance evaluations indicated she was failing to meet Carrington College's legitimate expectations.

45. Being one of the oldest faculty members, Ms. Hulbert became concerned about her job shortly after Ms. Sabaj, and later Ms. Larsen, began making what became a pattern of discriminatory statements about wanting to get rid of older faculty and/or hire younger faculty.

46. Ms. Hulbert also watched as a string of older faculty members were fired and/or harassed and forced out.

47. And, she also saw that Carrington was hiring substantially younger faculty members to replace those fired or forced out.

**COMPLAINT AND DEMAND FOR JURY TRIAL- 11**

48.	Ms. Sabaj and Ms. Larsen harassed Ms. Hulbert in several ways, including but not limited to the following examples:

- She was accused of not reflecting Carrington's subjective "TEACH" values. Notably, in years prior Ms. Hulbert had received positive comments about her "TEACH" values being complemented on her positive, professional and respectful interactions with students, faculty and staff. She was also commended for being a "true team player" and being strong in teamwork.

- Ms. Hulbert's schedule was changed on at least two occasions without asking for her input or giving her any notice. In contrast, other employees were given an opportunity to provide input about their schedules before changes were made. Ironically, when Ms. Hulbert questioned the first schedule change she was told she was not exhibiting the TEACH values. Then next time her schedule was changed she did not raise concerns as she did not want to be accused of not exhibiting TEACH values. However, she was later chastised for not seeking answers about the schedule changes in the written warning she received in April, 2015. This is an example of the no-win situation Ms. Hulbert found herself in.

- Ms. Larsen assigned Ms. Hulbert with an excessive workload and duties that younger employees were not required to perform. During the spring 2015 semester Ms. Larsen assigned Ms. Hulbert to teach four classes. Then, in addition to the two committees Ms. Hulbert already served on, Ms. Larsen attempted to arbitrarily assign her to a third committee. In contrast, Ms. Larsen assigned younger faculty members only two to three classes and only one or no committee

**COMPLAINT AND DEMAND FOR JURY TRIAL- 12**

- assignments.

- Ms. Larsen would schedule staff and/or committee meetings when Ms. Hulbert was scheduled to teach her classes.

- In April 2015, the negativity came to a head when Ms. Larsen and Mark Fuller called Ms. Hulbert into their office to issue her a written warning and Performance Improvement Plan, just as they had with Mr. Reaves, who had been fired a few months before. During the meeting, Ms. Larsen and Mr. Fuller recounted a series of events, many of which were inaccurate or misconstrued, that they alleged demonstrated that Ms. Hulbert was not meeting their expectations. According to them, Ms. Hulbert's alleged shortcomings were almost entirely related Carrington's subjective TEACH values.

49. Ms. Hulbert disagreed with most of what Ms. Larsen and Mr. Fuller described to her. However, Ms. Hulbert also believed there was little she could do to prevent her inevitable termination as it had occurred to numerous older employees before her. Ms. Hulbert became emotional and was forced to postpone the remainder of the meeting until the next day.

50. A few days after the meeting, Ms. Hulbert noticed that Carrington had posted an opening for a position identical to her own. The posting had been made only two days after Ms. Hulbert had been issued her written warning.

51. The stress caused by the ongoing harassment compounded with the written warning based on false or inaccurate information and the advertisement for her position, and in the context of the exodus of older employees, culminated into a perfect storm spiraling Ms. Hulbert into severe anxiety.

**COMPLAINT AND DEMAND FOR JURY TRIAL- 13**

52. Due to her severe anxiety, Ms. Hulbert was forced to take doctor-ordered medical leave on April 28, 2015. While on doctor-ordered medical leave, Ms. Hulbert and her medical provider concluded she was unable to resume working at Carrington given the hostile and discriminatory atmosphere.

53. On May 26, 2015, Ms. Hulbert involuntarily resigned by submitting a letter to Carrington College, explaining that:

> This resignation is necessary due to escalating negative physical health issues resulting from a hostile work environment promoted by the ageist remarks and actions of the Nursing Program Director Kelley Larsen and the previous Nursing Program Director, Ms. Sabaj, at Carrington College Boise. The fact that 5-6 colleagues (all in their 60's) were either fired or resigned played an important part in my decision to resign involuntarily. I was afraid I was next to be targeted since my job was posted Friday April 25, 2015 on the Chamberlin/Carrington College web site, just several days after receiving my first and only written warning.

## X.    FIRST CAUSE OF ACTION
### (*Age Discrimination in Violation of the ADEA and IHRA*)

54. Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth herein.

55. Plaintiffs are all individuals over 40 years old.

56. Carrington College subjected plaintiffs to adverse employment actions including but not limited to: burdening them with excessive workloads and/or staffing them with duties younger employees were not required to perform; unfairly scrutinizing their work; unfairly disciplining them; terminating Mr. Reaves employment in December 2014; and constructively discharging Ms. Gaipl and Ms. Hulbert in May 2015.

57. These adverse employment actions materially affected their employment.

58. The decision to subject plaintiffs to one or more of these adverse employment

actions was because of their age.

59.     Plaintiffs were replaced by substantially younger faculty members with lesser or equal qualifications.

60.     As a result of Carrington College's discriminatory conduct, plaintiffs have been damaged.  Plaintiffs are entitled to recover all resulting damages including lost pay and benefits, future lost pay and benefits, and emotional distress damages.

61.     Plaintiffs are also entitled to reasonable attorney's fees and costs incurred in bringing action.

62.     Carrington College's unlawful conduct toward plaintiffs in violation of the ADEA was done knowingly and/or with reckless disregard for their federally protected rights, and as such, Carrington College should be subjected to liquidated damages.

### XI.     SECOND CAUSE OF ACTION
### (Hostile Work Environment in Violation of ADEA and IHRA)

63.     Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth herein.

64.     Plaintiffs are over 40 years old.

65.     Defendants' conduct toward Plaintiffs, and as witnessed towards other older members of the faculty at Carrington College, were sufficiently severe and/or pervasive to create a discriminatory hostile work environment. This hostile work environment lead to the constructive discharges of Ms. Gaipl and Ms. Hulbert.

66.     Carrington is vicariously liable for the hostile work environment created by its managers and supervisors, and which culminated in tangible job actions.

67.     Carrington is also directly liable for the hostile work environment created by its

managers and supervisors because it knew, or reasonably should have known, about the harassment and failed to remediate it and/or it condoned or directed the harassment

68. As a result of Carrington College's discriminatory hostile work environment, Plaintiffs have been damaged. Plaintiffs are entitled to recover all resulting damages including lost pay and benefits, future lost pay and benefits, and emotional distress damages.

69. Plaintiffs are also entitled to reasonable attorney's fees and costs incurred in bringing action.

70. Carrington College's unlawful conduct in violation of the ADEA was done knowingly and/or reckless disregard for their federally protected rights, and as such, Carrington College should be subjected to liquidated damages.

### XII. THIRD CAUSE OF ACTION
**(Negligent Infliction of Emotional Distress)**

71. Plaintiffs incorporate the allegations contained in the paragraphs above as if fully set forth herein.

72. Carrington had a legal duty to: (1) not engage in discriminatory conduct based on age; and (2) exercise ordinary care to prevent unreasonable, foreseeable risk of harm to others.

73. Carrington breached its duties when it subjected Plaintiffs to an ongoing pattern of ageist comments followed by discriminatory, adverse employment actions against plaintiffs as described above.

74. As a direct and proximate result of the Defendants' conduct, Plaintiffs suffered emotional distress.

75. Plaintiffs physically manifested their emotional distress in one or more of the following manners: severe headaches, trouble sleeping, fatigue, stomach pains, loss of appetite,

irritability, and/or anxiety.

76. It was reasonably foreseeable that Plaintiffs would suffer emotional distress by being subjected to the harassment and discrimination by Carrington as described above.

## XIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in accordance with the provisions of Rule 38(a) and (b) of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and award the following relief:

a. Back pay, in amounts to be determined at trial;

b. Front pay, in lieu of reinstatement;

c. Compensatory and consequential damages including but not limited to past and future emotional distress, embarrassment, fear and anxiety, etc.;

d. Liquidated damages;

e. Pre-judgment interest and post judgment interest at the highest lawful rate;

f. Attorney's fees and costs of this action, including expert witness fees, as appropriate; and

g. For such other and further relief as this Court deems just and equitable.

RESPECTFULLY SUBMITTED this 22nd day of September, 2016.

**COMSTOCK & BUSH**

**COMPLAINT AND DEMAND FOR JURY TRIAL- 17**

                                           /s/ David E. Comstock
                                           David E. Comstock, Of the Firm
                                           Attorneys for Plaintiffs

                                           **STRINDBERG & SCHOLNICK, LLC**

                                           /s/ Erika Birch
                                           Erika Birch, Of the Firm
                                           Attorneys for Plaintiffs

**COMPLAINT AND DEMAND FOR JURY TRIAL- 18**